ANDREW BARNARD, Appellee,
*against*
LEMUEL CRANE, Appellant.

ACTION on the case, with a special and several general counts in the declaration. At last term the defendant pleaded *non assumpsit.* Issue joined and put to the Jury, who returned the following special verdict:

*An action will not lie to recover back money or chattels advanced upon a contract* malum in se.

*Rutland* County, Supreme Court of Judicature, *February* term, A. D. 1802.

*Special verdict.*

*Andrew Barnard*, Appellee,
v.
*Lemuel Crane*, Appellant.

In this cause the Jury do find, that the said *Andrew Barnard*, at *Hebron*, in the State of *New-York*, on the 24th day of *February*, A. D. 1800, did sell and deliver to the said *Lemuel Crane* the said span of colts, the said watch, and the said forty dollars in money, mentioned in the declaration, at an estimated value, to wit, the said watch at 25 dollars, the said span of colts at 60 dollars, and the said forty dollars at the same sum of 40 dollars; for which the said *Andrew Barnard* agreed to receive of the said *Lemuel Crane*, and the said *Lemuel Crane* undertook and promised to pay the said *Andrew Barnard*, a sum by

58

and beyond the just value of the said money and goods, in money, to wit, 50 dollars for said watch, 120 dollars for said span of colts, and 80 dollars for said 40 dollars; which said last mentioned money, so to be paid for said money and goods by the said *Lemuel Crane* to the said *Andrew Barnard* as aforesaid, was understood to be base and of less value than the common standard, but would, as was pretended, pass current without discovery of its baseness.

And the Jury do further find, that the said watch, colts and forty dollars in money, on the said sale and delivery thereof to the said *Lemuel Crane*, were left in the possession of the said *Lemuel Crane*, and the said *Lemuel Crane* then and there undertook and promised the said *Andrew Barnard*, that if he did not pay to the said *Andrew Barnard* the said sum of 250 dollars, agreeably to the aforesaid contract, that then and in that case, he the said *Andrew Barnard* should receive back the said span of colts, the said watch, and the said forty dollars in money, which should remain at his the said *Lemuel's* house until he the said *Andrew* should receive his said money agreeably to the aforesaid contract.

And the Jury do further find, that the said *Lemuel Crane* did not fulfil said contract by paying to the said *Andrew Barnard* the said sum of two hundred and fifty dollars, and that the said *Lemuel Crane* did not return the said span of colts, the said watch, or the said forty dollars in money, or any part thereof, to the said *Andrew Barnard*, but immediately after the making the said contract, the said *Lemuel Crane* did secrete the said span of colts, the said watch, and the said forty dollars in money, and keep them out of

the hands and knowledge of the said *Andrew Bar-*    Barnard
*nard.*

v.
Crane.

Now the Jury refer and subject their verdict on
the issue put to them to the determination of the
Honourable Court upon the law arising from the
above facts; that is to say,

If the Court are of opinion that the contract, as
above stated and found, is a contract valid in law and
binding upon the said *Lemuel Crane*, then the Jury
upon their oath do say, that the defendant did assume
and promise in manner and form as the plaintiff in his
declaration hath alleged, and find for the plaintiff the
sum of 140 dollars for his damages, and his costs.

But if the Court are of opinion, that the said con-
tract, as above stated and found, is not a contract
valid in law, and is not binding upon the said *Lemuel
Crane*, then the Jury upon their oath do say, that the
defendant did not assume and promise in manner and
form as the plaintiff in his declaration hath alleged,
and find for him his costs.

*Elias Post*, Foreman.

At this term the special verdict was argued and
decided.

A question was made who should open.

*John Cook*, for the plaintiff. We had conceived
it to be our right to proceed in the argument. The
plaintiff has always the priority to the Court or Jury,
excepting upon a plea in bar. We should not con-
tend, but considering this to be our right, as counsel
for the plaintiff, we had prepared our arguments ac-
cordingly, and had agreed that I should go forward

and open the cause. A different arrangement certainly would operate a surprise, if not an embarrassment.

*Samuel Walker,* for the defendant. We had considered it to be our right to proceed. *We object* to the plaintiff's right of action, and the objector always has precedence. However, as Mr. *Chipman,* who is with me, intimates that it is a matter of no importance with him who addresses the Court first, and as it appears my learned brother has wasted the midnight oil in preparing an argument calculated *solely to go forward,* and unhappily so unwieldy that it will not go any other way; in the exercise of that courtesy which ought ever to be the characteristic of our profession, especially in the presence of this Court, we shall permit him to proceed.

We had however hoped to have been indulged with an intimation from the Court whose the right is.

It is a general practice for the plaintiff's counsel to proceed in the argument upon a special verdict.

*Per Curiam.* It has generally been the practice for the plaintiff's counsel to proceed in the argument upon a special verdict.

*Cook.* That the Court may rule the special verdict in our favour, we shall rely on the following positions, which will embrace and refute every objection which can be made by the defendant's counsel.

First. That the whole facts found by the Jury shew an *executory* and not *a contract executed.*

Secondly. That the contract, as stated in the verdict, is a contract made in the State of *New-York,*

and that our statute does not attach itself to this contract.

Thirdly. That if there are general counts and special counts in a declaration, the plaintiff may, if he fails in proving his special count, prove his general counts, and recover under them.

In support of the first position, we observe, that the contract found by the verdict is,

That the plaintiff delivered to the defendant sundry chattels at an estimated price, and was to receive therefor double the amount in base money.

The defendant appears to be one of those swindlers which have of late infested the country, and the plaintiff one of those simple ones who has been duped by him.

The justice of the cause will incline the Court to decide in favour of the plaintiff. A contrary decision will go to encourage the swindler, and to support and protect him in his unrighteous gains.

If the cause is decided against us, it cannot be upon principles of justice simply considered, but upon those considerations of public policy, under the influence of which Courts of Law are often obliged to trench on the common requirements of justice, to turn a deaf ear to the cries of an injured suitor, and to sacrifice individual interest to the general good.

Hence the maxim, that *ex maleficio non oritur contractus, et in pari delicto potior est conditio defendentis;* upon which we imagine principal reliance will be had by our opponents. But in the application of this maxim of juridical policy, a distinction is made between contracts *executed,* and contracts *executory.*

If an illegal contract be executed, the plaintiff cannot recover; for *tunc potior est conditio defendentis.* But in a contract executory, if illegal, the plaintiff may recover ; for the contract not being perfected in contemplation of law, the consideration is done away, and the illegality of the contract does not attach itself to the action brought for the value of the property advanced.

In the present case, the contract being merely executory, the plaintiff does not go to recover for the breach of the illegal contract, but for the value of his property in the hands of the defendant; not for the base money, but for the watch, horses, and current money, eloigned by the defendant.

This position, that the contract was merely executory, will answer our purpose to take our client out of the general rule above recited. We might indeed go further, and shew, from the case of *Wilkinson* v. *Kitchen*, 1 Ld. *Raym.* p. 89. in the case of the *Newgate* solicitor, that money received upon illegal contract may be recovered back, though the contract *had been completely executed.* But we shall only insist on the distinction between contracts executory and those executed.

In the case of *Lacaussade* v. *White*, tried before Lord *Kenyon* at *Nisi Prius*, *Espinasse's Reports of* *Cases at Nisi Prius*, vol. 2. p. 630, 631. and afterwards, on motion to set aside the verdict decided in the Court of King's Bench, *Durnf. & East*, p. 535. we find this distinction fully recognised. The declaration in this case stated, that in consideration that the plaintiff had, on the 11th day of *January*, in the year of our Lord 1797, paid the defendant the sum

Day's edit. p. 629, 630.

of 100*l.* he agreed to pay to the plaintiff the sum of 300*l.* if articles forming the basis of a peace, and signed by official characters, by which hostilities would cease and would not recommence, were not settled between *England* and *France,* on or before the 11th of *September,* 1797. Plea of *non assumpsit.* *Gibbs,* counsel for the defendant, acknowledged this to be an illegal transaction, and quoted the maxim, *in pari delicto potior est conditio defendentis;* but insisted that the contract had been executed and the wager lost. He conceded, that if *it had been executory* the plaintiff might have recovered back his money, and said the point was so decided in the case of *Lowry* v. *Bourdieu, Doug.* 467. and there was a verdict for the plaintiff for the 100*l.* with liberty for the defendant to move to set it aside, and have a nonsuit entered.

In the Court of King's Bench, on the argument upon this motion, the Court refused the rule. *Gibbs* took the same distinction between cases of this sort where the contract was executed and where it was executory, and admitted, that where the wager is illegal either party may recover back his deposit so long as the contract remains *executory.* But the Court said it was more consonant to the principles of sound policy and justice, that where money has been paid upon an illegal consideration, it may be recovered back again by the party who has thus improperly paid it, than by denying the remedy to give effect to the illegal contract, and referred to the case of *Cotton* v. *Thurland,* 5 *Durnf. & East,* p. 405. and though it will appear that this case, which we shall read, was decided upon another point, yet the dis-

tinction between contracts executory and executed, it is evident, was considered by all the learned counsel to be sound, although the Bench had no occasion to express an opinion upon it; for it is evident in that case, as is too common in our own Courts, the *English* gentlemen of the bar insisted very zealously and argued very profoundly upon points which the Bench considered of no importance in the decision of the cause.

But a question will arise, whether the present parties are *in pari delicto*.

In the case of *Clark* v. *Shee and Johnson*, reported by *Cowper*, p. 200. Lord *Mansfield* observed, that there are two sorts of prohibitions enacted by positive law in respect of contracts:

First. To protect *weak* or necessitous men from being overreached, defrauded or oppressed. There the rule, *in pari delicto potior est conditio defendentis*, does not hold, and an action will lie, because, where the defendant imposes upon the plaintiff, it is not *par delictum*.

His Lordship instances the case of *Smith* v. *Bromley, coram* Lord *Mansfield*, 1760. *Bull. N. P.* 132. This is a mistake in the page; it should be 138. The case in *Buller* is, that the plaintiff's brother being a bankrupt, an agent for one of the creditors told her, that for money his client would sign the certificate. She gave 40*l.* The certificate was signed. She brought *assumpsit*, and recovered.

We may add the case of a usurious contract. The usury may be recovered back, because the defendant is not *par delictum*. He who pays the usury is oppressed, and the law makes an allowance for the pres-

sure of his circumstances, and to deny the borrower redress would be to sanction the illegal contract of the usurer.

In the present case it is obvious, that the State is infested by a horde of villains whose business is to prey upon the weak and the credulous ; men who bring with them from elder countries an adroitness in the crooked arts of circumvention which is an over-match for the simplicity of our infant state of society. By one of these our client has been imposed upon. It is true the verdict says that the money he was to receive was to be base ; and it is obvious, from the sum proposed to be paid by the defendant, compared with the estimated value of the chattels de-livered by the plaintiff, it was so. But this does not conclude that our client so considered it. *That* plau-sible lubricious language, which could entice our client to a contract of this nature, might easily blind him to the true value of the money. It is true it is difficult to conceive how the plaintiff could so view it. But who shall set bounds to the weakness and cre-dulity of man? Does not every day present instances of equal credulity in men far superior in sagacity to our client? Who is there that has not some time in his life been egregiously duped. Even the learned world has its dupes, and philosophers are persuaded to credit the marvellous and impossible, while men of common minds and common acquirements won-der at their credulity.

Shall it be said then, that these parties are *in pari delicto?* that cunning and simplicity are on par?

The question now is, and it is a question of mag-nitude, whether it is good policy to apply the maxim

of *in pari delicto, &c.* to cases of this sort, in our present state of society; whether the Court, by deciding against the plaintiff, will in effect confirm these deceptive contracts, and suffer the swindler to triumph in his unjust gains, or whether they will consider the plaintiff as a weak and oppressed man, and by deciding in his favour break the net of the fowler and set the captive free, and teach these cunning marauders on society, that they must be brought to a strict account for their crooked practices, and be obliged to disgorge their prey. This is a question of policy; and if it has been thought proper to deny men redress in the Courts of Law on the failure of an illegal contract in certain cases, on account of the operation it might have on society, it is well deserving of consideration what will be the effect in our state of society, to suffer the swindler to be protected by law in the possession of the property swindled; for we can see no distinction in effect between protecting the swindler *collaterally,* or by solemn decision affirming his right to prosecute his base contracts.

But if the parties should be considered *in pari delicto,* and the distinction we have taken between contracts executory and contracts executed, is not sound or is inapplicable to this case, it will bring us to the consideration of our second position.

*Vermont* Stat. vol. 1. p. 342.

That the verdict finds the contract to have been made in the State of *New-York.* This takes it out of our statute against swindling, and of our statute against passing counterfeited money.

It does not appear that there is any statute against crimes of this kind in the State of *New-York,* and the commission of them is certainly no crime at com-

mon law. But if there are any such statutes in that State, an illegal act done contrary to the laws, and within another State, is not to be drawn into question here.

By the Court. The Court do not incline to hear this point argued. There is an existing statute in the State of *New-York* against passing counterfeited coins, passed 7th of *February*, 1788. If no such sta tute existed, we presume it would have been considered there as a crime at common law. The passing base money *knowingly* carries fraud of the basest kind upon the face of it. It is against good morals, which are the basis of the common law. An act illegal and fraudulent by the common law carries with it its turpitude whenever it is brought into view of a Court of Justice.

*Cook.* We shall then proceed to establish our third position.

That if there are general counts and a special count in a declaration, the plaintiff may, if he fails of maintaining his special count, safely rely on his general counts.

In the case of *Clark* v. *Shee and Johnson*, already read, there was a special count and several money counts. In speaking of these general counts, upon the point whether the plaintiff could maintain this action upon them, Lord *Mansfield* observed, that the general *indebitatus assumpsit* is a liberal action in the nature of a bill in equity; and if under the circum-stances of the case it appears that the defendant can-

Barnard
v.
Crane.

not in conscience retain what is the subject matter of it, the plaintiff may and will support this action.

Let the inquiry in the present case be, can the defendant in good conscience retain the property received from the plaintiff?

In the case of *Lacaussade* v. *White*, already cited, there was a special count, setting forth the wager. The declaration also contained the common money counts. On the trial at *Nisi Prius*, upon the opening of the case, Lord *Kenyon* asked the plaintiff's counsel if the wager in question was not of the description of those which could not support an action as being contrary to the policy of the state.

*Garrow*, for the plaintiff, admitted the force of his Lordship's objection, that the special count could not be maintained, but contended that he could recover the 100*l.* paid by him in the count for money had and received; and the plaintiff had a verdict on the money counts, which was afterwards affirmed in the King's Bench.

In the present case we contend that the special count will lie; but if we are incorrect, the general counts will support a decision in our favour, on the facts found by the special verdict; for our action is not brought, as in the case of *Lacaussade* and *White*, to enforce an illegal contract, but merely to recover back property advanced upon a mere executory contract; and this reminds me of an observation I had intended to have made, that where a contract is ever so illegal, while it is merely executory or *in transitu*, either party may rescind the contract, and have his action to recover back the property which he may have advanced in the course of the traffic.  We find

this doctrine laid down in the case of *Cotton* v. *Thur-land*.   Our client, by instituting the present suit, has given plenary evidence of his rescinding the contract, which was only executory.

We therefore, on all these points, rest assured of a decision in our favour.

*Daniel Chipman, contra.*  The contract upon which the action is founded, as disclosed by the special verdict, is, that the watch, horses, &c. delivered by the plaintiff to the defendant, were to be paid for by the latter to double the amount of their estimated value in counterfeit money.    What follows in the verdict is mere surplusage.

The question is, can this contract be enforced ? or on its failure can the money or property advanced be recovered back ?

If we had no authorities to guide, and no axioms of the *English* jurists to enlighten us, we should all see that there is something wrong in the very idea of a Court of Justice enforcing an immoral contract.

If two burglers, after having robbed a house, should disagree as to the division of the spoil, and one should bring his action against the other to recover his share of the booty, the entire voice of community would be against sustaining such action.    It may be said this is a strong case.    True : but the maxims of the *English* law, *ex dolo malo non oritur actio, et ex maleficio non oritur contractus, et in pari delicto potior est conditio defendentis aut possidentis*, cover the present case equally with that I have put.

It is said a distinction is made between an illegal contract executory or executed ; that in the former

Barnard
v.
Crane.

case an action will lie to recover back property advanced on an illegal contract, and therefore this is an exception to the general rules; and yet in the case of *Tompkins* v. *Barnet*, 1 *Salk.* p. 22. the contracts appear to have been executory, but the Court ruled, that the action would not lie; and *Treby*, Chief Justice, observed, that where a man pays money on a mistake in an account, or where one pays money under or by a mere deceit, it is reasonable he should have his money again; but where one knowingly pays money upon an illegal consideration, the party that recovers it ought to be punished for his defence, and the party who pays it is *particeps criminis*, and there is no reason he should have his money again, for he parted with it freely, and *volenti non fit injuria*,

The intent and application of this principle is clearly expressed by Lord *Mansfield* in delivering his opinion in the case of *Holman et al.* v. *Johnson*, alias *Newland*, in *Cowper's Reports*, p. 343.

"The objection that a contract is immoral or illegal as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed, but it is founded in general principles of policy, which the defendant has the advantage of, contrary to real justice, as between him and the plaintiff, by accident, if I may so say. The principle of policy is this, *ex dolo malo non oritur actio*. No Court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act. If from the plaintiff's own stating or otherwise, the cause of action appear to arise *ex turpi causa*, or the trans-

gression of a positive law of this country, there the Court says he has no right to be assisted. It is upon that ground the Court goes, not for the sake of the defendant, but because they will not lend their aid to such a plaintiff. So if the plaintiff and defendant were to change sides, and the defendant was to bring his action against the plaintiff, the latter would then have the advantage of it; for where both are equally in fault, *potior est conditio defendentis.*"

The question in this case is the same with that now under consideration. Is the plaintiff's demand founded upon the ground of any immoral act or contract, or upon the ground of his being guilty of any thing which is prohibited by a positive law of this country.

Can there exist a doubt that the plaintiff's action is grounded upon an immoral act? that he entered into an illegal contract, expressly prohibited by the statute law of this State? If he had received the base coin which he contracted to receive, would it not have been highly criminal in him if he had passed it to others? and this must have been his design in contracting for it. Would it not have exposed him to infamous punishment.

If the contract is founded upon an immoral act, or upon the ground of doing any thing prohibited by positive law, it is of no importance whether executory or executed. Here the contract was both *malum prohibitum* and *malum in se.* Therefore the cases cited by the gentleman opposing do not apply.

The case of *Lacaussade* v. *White,* in which a verdict was taken for the plaintiff, and affirmed in the Court of King's Bench, exhibits a contract neither

*malum prohibitum* or *in se*. It was a wager about a peace between *England* and *France*, and Lord *Kenyon* declared, that it turned on a matter of public policy. And here the question was properly made, whether the contract was executory or executed; for his Lordship expressly declared, that if the contract was *malum in se*, the money could not be recovered back.

It is said that the plaintiff is not *par delictum*. It is true, that in contracts made in breach of certain penal statutes, which give a penalty against only one of the contracting parties, both are not considered *in pari delicto;* as in case of usury, and in case of money advanced by the relation of a bankrupt, extorted by a creditor for signing the bankrupt's certificate, *Doug.* 697. and the case of *Jacques* v. *Golightly,* 2 *Black. Rep.* 1073. where the plaintiff brought his action to recover back premiums advanced by him for insuring lottery tickets; and so in *Jacques* v. *Withy,* 1 *H. Black.* 65. Here the parties were not *in pari delicto.* The penal statutes had distinguished the criminal by subjecting him only to the penalty, and considered the other party as oppressed or overreached, and the acts were merely *mala prohibita;* but where the act or contract is *malum in se,* the parties are both considered *in pari delicto,* and the maxim applies with force, *ex dolo malo non oritur actio.*

Of the case of the *Newgate* solicitor, cited from Lord *Raymond,* we have but a short note, and doubts may arise whether the case is correctly reported. It certainly is not much relied upon in subsequent cases of the same nature.

It is said, if the verdict cannot be decided in favour of the plaintiff upon the special it may on the money counts. But it remains to be shewn, that the principles we have advanced do not apply to the entire declaration.

It is said, that an illegal contract may be rescinded, while *in transitu.* But when did the plaintiff rescind? When he despaired of receiving the base money. Is this repentance or disappointment?

The only question which can be made in this cause, is, whether, in our state of society, it will be most eligible, as a principle of public policy, to adhere to the maxim which requires all suitors to come into Court with clean hands, or to abandon it, and have our Courts descend from the dignified bench of morals and justice, to hear and adjust the immoral claims of the profligate; whether it is preferable to teach our citizens to beware criminal contracts by letting them know, that if they are duped by their companions in vice, they must look for no redress from the laws of their country, or to assure them that they may safely enter into the most criminal contracts; for though they have been violating the laws, and plotting against the honest part of community, yet, if they fail in their villanous designs, the law, with a view to punish their accomplices, will give them as ample recompense as if they had been honest and injured.

How this question ought to be determined I have no doubt, and I believe the Court have none.

*Walker,* in addition, merely read the case of *Walker* v. *Page,* 3 *Burr.* p. 1568.

60

*Cephas Smith*, Junior, in reply. We have neither inclination or occasion to contest the maxim, *in pari delicto potior est conditio defendentis;* but we consider our case not to be within it.

It appears, where the contract is executory the maxim does not apply.

We have shewn a case where the illegal contract was even *executed*, and the money was recovered back; but it is said there is but a short note of this case from Lord *Raymond's* Reports, and that the case has been lightly esteemed in subsequent decisions.

As to the brevity of the case, there is sufficient reported to shew both its nature and the principle which governed its decision; and so far from this case having been lightly esteemed in more recent decisions, in the case of *Cotton* v. *Thurland*, tried in the King's Bench, 1793, Judge *Grose*, in giving his opinion, declared expressly, that though he had subscribed to an adverse decision determined at *Nisi Prius* by *Wilson*, Justice, yet he was governed in this case by the case cited from Lord *Raymond*, (which it appears was this same case of *Wilkinson* v. *Kitchen*,) and by *Buller's Nisi Prius*, which we have also read in the opening.

Whilst the case of *Tompkins* v. *Barnet*, cited by Mr. *Chipman* from 1 *Salk.* is reprobated by Lord *Mansfield* in the case of *Clark* v. *Shee and Johnson.* His Lordship's words are, " The case of *Tompkins* v. *Barnet* has been long exploded. In *Bosanquet* v. *Dashwood*, Lord *Hardwicke* and Lord *Talbot* both declared their disapprobation of it." Lord *Mansfield*

also said, " that case had been denied a thousand times."

The principle is, that where an illegal contract is entered into, while it is executory either party may rescind it, and maintain an action to recover back the money or property advanced upon it.

This seems to be a principle borrowed from the divine law: when a man sins against the law of his country, he shall have a time for repentance and amendment. A man may hastily, thoughtlessly, or ignorantly infringe the law, and upon reflection wish to rectify his error. The law encourages such wholesome resolutions, and allows him a term to carry them into effect, to wit, from the time of entering into the contract until it is completely executed.

But it is said that there is no time allowed for rescinding a contract *malum in se.* But the contract *malum in se* and a contract *malum prohibitum* are put upon the same footing in the books, and no good reason can be shewn why a man may not rescind one as well as the other. If the contract be immoral, the contractor has a greater obligation, and the law ought to hold out as great an inducement, and give as liberal an opportunity for him to repent and rescind it, as if the contract was merely prohibited by the statute law.

It is said the plaintiff did not rescind until disappointed of receiving the base money. The plaintiff's motives to rescind the contract, are not now to be inquired into. The law looks in these cases to a man's acts, not to his motives. The law has pointed out his day of grace, to wit, while the contract is *in transitu,* and he has rescinded within this term.

Barnard
v.
Crane.

We consider with the gentleman, that the great question in the present case is, to what extent the maxim, *ex maleficio non oritur contractus, et in pari delicto potior est conditio defendentis*, shall be applied in our state of society. Protesting, however, that our client is not *par delictum* with the defendant; for we find numerous cases in the books where the contractors to an illegal contract, even immorally illegal, as in the case cited by Sir *Bartholomew Showers,* in the case of *Wilkinson* v. *Kitchen,* where a bribe was given to a custom-house officer, are not considered *in pari delicto.*

The principle seems to be, that where one of the parties to an illegal contract is oppressed or over-reached, the law makes an allowance for human frailty, and lends its aid to protect him who is thus oppressed or overreached, provided he rescinds the illegal contract before it is fully executed.

To bring this home to our own state of society. It is obvious a horde of swindlers are daily employed in overreaching the ignorant and credulous, by sometimes advancing, but oftener promising to give them money, which they have the address to persuade simple people is as good as current coin, and thus enticing them to part with the acquirement of their honest industry, to the great and frequent impoverishment of their families. The Legislature have passed an especial act against such nefarious and ruinous practices; but it has not cured the evil, and we consider and trust, that the Court will consider, that the last, best, and only measure to be adopted to check such pernicious practices, is to force such swindlers to refund their ill-gotten gains.

Let then the maxim of the common law be preserved in full force as a general rule, but suffer the plaintiff's case to be an exception to it, considering the decision as grounded on the present state of society, and the peculiar circumstances of the imposition practised upon him.

Judgment for the defendant, and costs. The Chief Judge dissenting.

*Cephas Smith*, Junior, and *John Cook*, for the plaintiff.

*Daniel Chipman* and *Samuel Walker*, for the defendant.